**Hearing Date:  October 28, 2015, 10:00 a.m.**
**Response Deadline: August 27, 2015**

**DICKSTEIN SHAPIRO LLP**
1633 Broadway
New York, New York  10019-6708
Eric B. Fisher
Barry N. Seidel
(212) 277-6500
(212) 277-6501 (fax)
fishere@dicksteinshapiro.com
seidelb@dicksteinshapiro.com

*Attorneys for Khronos LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>                    Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>                   Defendant. | SIPA LIQUIDATION<br><br>No.  08-01789 (SMB)<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>                   Debtor, | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>               Plaintiff,<br><br>v.<br><br>LEGACY CAPITAL LTD. and KHRONOS LLC,<br><br>                Defendants. | Adv. Pro. No. 10-05286 (SMB) |

**KHRONOS LLC'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION**
**TO DISMISS THE AMENDED COMPLAINT UNDER BANKRUPTCY**
**RULE 7012(b) AND FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF FACTS ..............................................................................4

    I.    KHRONOS, LEGACY, MONTPELLIER AND BNP ...........................4

    II.    RENAISSANCE TECHNOLOGIES, LLC ..............................................6

    III.    THE CENTRAL CONTENTION OF THE AMENDED COMPLAINT IS CONTRADICTED BY FACTS CONTAINED IN DOCUMENTS EXPRESSLY RELIED ON BY THE TRUSTEE .................................7

ARGUMENT ...............................................................................................12

    I.    THE TRUSTEE HAS FAILED TO PLEAD KHRONOS IS A SUBSEQUENT TRANSFEREE OF AN INITIAL TRANSFER ........................13

    II.    THE TRUSTEE HAS FAILED TO PLEAD WILLFUL BLINDNESS AND KHRONOS' GOOD FAITH IS A COMPLETE DEFENSE TO THE FRAUDULENT TRANSFER CLAIMS ..............................................16

        1.    The Trustee Has Pled Facts Showing Khronos Gave Value..........17

        2.    The Trustee Has Failed To Meet His Burden Of Pleading Khronos Was Willfully Blind To The Fraudulent Scheme ..........17

    III.    THE TRUSTEE HAS FAILED TO PLEAD THAT KHRONOS HAD ACTUAL KNOWLEDGE OF THE PONZI SCHEME .......................................22

CONCLUSION ............................................................................................25

DOCSNY-590841

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Asahi Glass Co., Ltd. v. Pentech Pharm., Inc.*,
  289 F. Supp. 2d 986 (N.D. Ill. 2003) ...................................................................12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................13

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................12, 13

*Benedict v. Amaducci*,
  No. 92 CIV. 5239, 1995 WL 702444 (S.D.N.Y. Nov. 28, 1995) .............................3

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.
  Fabrikant & Sons, Inc.)*,
  480 B.R. 480 (S.D.N.Y. 2012).................................................................................15

*Gowan v. Amaranth LLC (In re Dreier LLP)*,
  452 B.R. 451 (Bankr. S.D.N.Y. 2011) ...................................................................14

*Jeanette Coquette Co. v. Hartford Fire Ins. Co.*,
  No. 93 CIV. 4418 (KMW), 1995 WL 363864 (S.D.N.Y. June 19, 1995)................3

*Marshall v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,
  740 F.3d 81 (2d Cir. 2014)..................................................................................6, 17

*Newman v. Family Mgmt. Corp.*,
  748 F. Supp. 2d 299 (S.D.N.Y. 2010), *aff'd*, 530 F. App'x 21 (2d Cir. 2013).......18

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*,
  458 B.R. 87 (Bankr. S.D.N.Y. 2011)..................................................................14, 15

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014)............................................................ passim

*SEC v. Cohmad Sec. Corp.*,
  No. 09 Civ. 5680(LLS), 2010 U.S. Dist. Lexis 8597 (S.D.N.Y. Feb. 1, 2010)......19

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015)...............................................................13, 14

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  516 B.R. 18 (S.D.N.Y. 2014)............................................................................16, 17

DOCSNY-590841

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
    No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ...................................22

*Stephenson v. Citco Grp. Ltd.*,
    700 F. Supp. 2d 599 (S.D.N.Y. 2010), *aff'd sub nom. Stephenson v.*
    *PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012)........................................18

## STATUTES

11 U.S.C. § 546(e) ...............................................................................................3, 22, 23, 25

11 U.S.C. § 548(a)(1)....................................................................................................15

11 U.S.C. § 550(a)(2)....................................................................................................13

11 U.S.C. § 550(b) ........................................................................................................16

DOCSNY-590841

Khronos LLC ("**Khronos**") respectfully submits this memorandum of law in support of its motion to dismiss the amended complaint filed by Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") (the "**Trustee**") on July 2, 2015, ECF No. 112 (the "**Amended Complaint**").

## PRELIMINARY STATEMENT

In this action, the Trustee seeks to recover alleged subsequent transfers of BLMIS customer property from Khronos, an entity that provided certain account management services to defendant Legacy Capital Ltd. ("**Legacy**"), a BLMIS accountholder.  The Amended Complaint against Khronos fails for numerous reasons and should be dismissed.

As an initial matter, the Amended Complaint fails to identify any of the "vital statistics" about the subsequent transfers it seeks to recover and makes no attempt to trace those unidentified subsequent transfers back to BLMIS.  Indeed, to grant this motion and dismiss the Amended Complaint as to Khronos, this Court need only examine paragraphs 148, 149, 150 and 151.  That is all that needs to be examined, because those are the *only* paragraphs where the Trustee makes any attempt to describe the supposed subsequent transfers to Khronos.  In those paragraphs, the Trustee alleges that Khronos received investment management fees from an entity called Montpellier Resources Ltd. ("**Montpellier**"), but makes no attempt to state the amount of any transfer from Montpellier or the date of any such supposed transfer.  Further, the Trustee fails to trace any of the unidentified supposed transfers from Montpellier to Khronos back to BLMIS in any way, and thus the Amended Complaint provides no basis from which it may be inferred that these unidentified subsequent transfers involved BLMIS customer property.

The Amended Complaint also alleges that Khronos was paid a $42,000 annual fee by Legacy for its account management services; but, again, the Amended Complaint fails to identify any particular transfer, in any particular amount, on any particular date.  This Court has been

clear with the Trustee that this lack of specificity is a fatal defect, requiring dismissal of the subsequent transferee claim against Khronos.

In the event that the Court does not dismiss the Amended Complaint due to its glaring failure to identify the transfers at issue, then the Court should dismiss the Amended Complaint against Khronos for the independent reason that it fails to plausibly allege Khronos' lack of good faith (and concedes that Khronos provided value to Legacy in the form of accounting services). Here, to plead lack of good faith, the Trustee must allege facts from which this Court can plausibly infer that Khronos was willfully blind to the BLMIS Ponzi scheme.

On the issue of willful blindness, the Amended Complaint self-destructs. According to the allegations in the Amended Complaint, Khronos became privy to an analysis performed by Renaissance Technologies, LLC ("**Renaissance**"), in which Renaissance personnel raised "red flag" concerns about BLMIS. The Amended Complaint then goes on to allege that Khronos' response to this information was to undertake further analysis for the benefit of its client, Legacy. In other words, the Amended Complaint itself pleads the opposite of willful blindness – rather than turn away from these red flags, Khronos investigated them.

The Amended Complaint fails to plausibly allege Khronos' willful blindness for many other reasons as well. The allegations in the Amended Complaint are contradicted by the very documents relied on by the Trustee. To provide just one example (many others are described elsewhere in this brief), while the Trustee contends that the Renaissance analysis described in the Amended Complaint showed that BLMIS was operating a Ponzi scheme, the Renaissance personnel themselves involved in that analysis stated clearly on numerous occasions to the SEC that they never suspected that Madoff was operating a Ponzi scheme.

DOCSNY-590841

The Amended Complaint fails to allege any fact from which it may be inferred that Khronos (or any of its agents) subjectively believed that there was a high probability that BLMIS was operating a Ponzi scheme.  In other words, while the Amended Complaint pays lip service to the applicable willful-blindness standard, its recitation of that standard is merely a bare legal conclusion unsupported by plausible allegations of fact.

Finally, to the extent that the Amended Complaint seeks to recover subsequent transfers that occurred more than two years before the BLMIS petition date – and it is impossible to know whether any such transfers are at issue in this action because, as mentioned above, not a single transfer is specifically identified – any claim to such a transfer should be dismissed because there is no plausible allegation that Khronos actually knew BLMIS was a Ponzi scheme.  Thus, any transfer beyond that two-year period is barred by the section 546(e) safe harbor of the Bankruptcy Code.

The Amended Complaint's failings are particularly egregious in this case, which is now more than four-and-a-half years old and where the Trustee sought and received extensive pre-complaint discovery from both Khronos and Renaissance under Rule 2004 of the Bankruptcy Rules.  To avoid unnecessary motion practice about leave to amend the complaint and in an effort to advance this case towards resolution, Khronos consented to allow the Trustee the "second bite at the apple" reflected in the Amended Complaint.  The Trustee has now had more than ample opportunity to try to plead a viable claim against Khronos.   Under these circumstances, this Court should dismiss the claim against Khronos with prejudice.  *Benedict v. Amaducci*, No. 92 CIV. 5239, 1995 WL 702444, at *9 n.5 (S.D.N.Y. Nov. 28, 1995); *Jeanette Coquette Co. v. Hartford Fire Ins. Co.*, No. 93 CIV. 4418 (KMW), 1995 WL 363864, at *5

DOCSNY-590841

(S.D.N.Y. June 19, 1995) (dismissing counterclaims with prejudice, in part, because party already amended counterclaims once).

**STATEMENT OF FACTS**

Most of the facts set forth below are based upon the allegations in the Amended Complaint. As with any motion to dismiss, this Court is largely confined to the Trustee's version of events in connection with this motion, though Khronos does not concede the truth of any of the Trustee's allegations. As explained in Part III of this Statement of Facts, however, the central contention of the Amended Complaint – that the Renaissance Report (defined below) imparted actual knowledge of the BLMIS fraud to Khronos or rendered Khronos willfully blind to the fraud – is contradicted by documents expressly relied on by the Trustee. In fact, as demonstrated below, the Trustee selectively quotes from various Renaissance documents to give a false impression of what was known at the time by Renaissance and other parties. On that critical issue, this Court is not bound by the Trustee's false version of events, but instead may consider the additional parts of those same documents, as well as use common sense, to reject the implausible inferences urged by the Trustee.

**I.    KHRONOS, LEGACY, MONTPELLIER AND BNP**

Khronos is a limited liability company that provides investment management services. Am. Compl. ¶¶ 30, 35. According to the Amended Complaint, Khronos was founded by Rafael Mayer and David Mayer, who were also two of its managing directors. *Id.* ¶¶ 1, 31. Khronos provided certain financial and accounting functions to Legacy. *Id.* ¶¶ 35, 52. Legacy is a British Virgin Islands company formed in 2000. *Id.* ¶¶ 32-33. Rafael Mayer was an officer of Legacy. *Id.* ¶¶ 1, 33. Legacy invested in BLMIS through Account No. 1FR071 (the "**Legacy Capital Account**"), and it is named as an initial-transferee defendant in the Amended Complaint. *Id.* ¶ 33. Khronos' services to Legacy were provided pursuant to a January 1, 2004 accounting

4

services agreement (the "**Accounting Services Agreement**") (attached to the accompanying Declaration of Eric B. Fisher, dated July 30, 2015 (the "**Fisher Declaration**"), as Exhibit A (MAY0019168-74)) for which it received an annual fee of $42,000 and one-time fees for historical pricing services that it provided to Legacy.  According to the Amended Complaint, in 2004, Khronos received fees from Legacy totaling $154,690.  Am. Compl. ¶¶ 2, 150.  In total, the Trustee alleges that Khronos received $319,190 for the accounting services it provided to Legacy.  *Id.* ¶ 150.

According to the Amended Complaint, Khronos also acted as a service provider to funds that ultimately invested in Legacy, including Montpellier.  *Id.* ¶¶ 148-149.  From 2004, Khronos served as investment manager for Montpellier, for which it received a monthly fee equal to 1.2% of Montpellier's net asset value based upon the entirety of Montpellier's investment portfolio.  *Id.* ¶ 148.  From 2004 to 2005, Khronos also received a performance fee of 5% of Montpellier's new net investment profits – again, based upon the entirety of Montpellier's investment portfolio.  *Id.* ¶ 149.  Between 2006 and 2008, Khronos received a performance fee equal to 10% of Montpellier's new net investment profits on the entirety of its investment portfolio.  *Id.*  It should be noted that the Amended Complaint does not allege what percentage of Montpellier's overall investment portfolio was invested with Legacy.  That omission is not surprising given that Montpellier's indirect BLMIS investment through Legacy was a very small percentage of its overall portfolio.[1]

---

[1]    Although the Trustee does not name the document in the Amended Complaint, he quotes extensively from, and clearly relied upon, Montpellier's private offering memorandum, a copy of which is attached to the Fisher Declaration as Exhibit B.  That private offering memorandum makes clear that Montpellier's investment strategy relied upon a "diversified portfolio of alternative investment strategies."  Fisher Decl. Ex. B, at 1.

DOCSNY-590841

The Amended Complaint alleges that, in total, Khronos received $6,601,079 in fees from Montpellier and Legacy, and further alleges that all of those fees are subsequent transfers subject to avoidance and recovery.  Am. Compl. ¶ 151.

The Trustee alleges that during the six years prior to the December 2008 filing date (the "**Filing Date**"), BLMIS made payments or other transfers from the Legacy Capital Account in the amount of $212,800,000.  *Id*. ¶ 143.  This included $125,800,000 transferred directly to Legacy and $87,000,000 transferred directly to BNP Paribas Dublin Branch ("**BNP**") as a partial repayment of a $100 million secured loan pursuant to a July 26, 2004 credit agreement between BNP and Legacy (the "**Credit Agreement**") (the "**Six Year Transfers**").  *Id*. ¶¶ 140, 142-143; *Id.* Ex. A.  During the two years prior to the Filing Date, BLMIS made transfers from the Legacy Capital Account in the amount of $174,000,000.  *Id*. ¶ 144.  This included $87,000,000 transferred directly to Legacy and $87,000,000 transferred directly to BNP (the "**Two Year Transfers**").  *Id.* ¶ 144; *Id.* Ex. A.  The Trustee seeks to recover both the Six Year and Two Year Transfers solely from Legacy, as an initial transferee, including those transfers made directly to BNP.[2]  *See id*. Counts I-VII.

## II.   RENAISSANCE TECHNOLOGIES, LLC

In support of his allegations against both Khronos and Legacy in the Amended Complaint, the Trustee relies almost exclusively on communications that Rafael Mayer supposedly received from personnel at Renaissance, alleged to be a New York hedge fund management company.  Am. Compl. ¶ 38.  Specifically, Rafael Mayer sat on an investment oversight committee (the "**Meritage Committee**") for Meritage Fund Ltd. ("**Meritage**"), an

---

[2]     Although the Amended Complaint contains allegations about transfers that occurred before the Six Year Transfers, any claims as to these transfers are time-barred.  Am. Compl. ¶ 142.

DOCSNY-590841

investment fund affiliated with Renaissance. *Id*. ¶¶ 1, 40-41. Among other investments, Meritage had indirectly invested with BLMIS through a swap agreement. *Id*. ¶ 39. Central to the Trustee's claims is a 2003 investigation of BLMIS that Renaissance commenced and ultimately shared with the Meritage Committee, including Rafael Mayer, on October 6, 2003 (the "**Renaissance Report**") (attached to the Fisher Declaration as Exhibit C (RE00004136-81)). *Id*. ¶¶ 46-47. The Renaissance Report raises concerns about Meritage's indirect investment in BLMIS. *See infra* note 4; Am. Compl. ¶ 47.

The Trustee falsely suggests that the Renaissance Report led the Meritage Committee to conclude that BLMIS was a Ponzi scheme and prompted the Meritage Committee to immediately withdraw its indirect investment in BLMIS through Legacy. Am. Compl. ¶¶ 2, 47-51. The Trustee contends that Rafael Mayer's knowledge of the Renaissance Report, which prompted Legacy to engage Khronos to further analyze the BLMIS investment, imparted to Mr. Mayer actual knowledge of the fraud, which knowledge the Trustee then imputes to Khronos and Legacy. *Id*. ¶¶ 53-54, 145, 153. Essentially relying on those same allegations, the Trustee also contends, alternatively perhaps, that Khronos and Legacy were willfully blind to the BLMIS Ponzi scheme. It should be noted that, while the Amended Complaint concedes that the Renaissance Report prompted Legacy to have Khronos further analyze the BLMIS investment, the Amended Complaint does not state in any detail what further analysis Khronos performed or what it concluded. *Id*. ¶ 52. In other words, the Amended Complaint is devoid of any allegations concerning Khronos' subjective understanding of BLMIS.

## III.  THE CENTRAL CONTENTION OF THE AMENDED COMPLAINT IS CONTRADICTED BY FACTS CONTAINED IN DOCUMENTS EXPRESSLY RELIED ON BY THE TRUSTEE

The Trustee's core premise – that the Renaissance Report provided Rafael Mayer with actual knowledge that BLMIS was a fraudulent scheme – is flawed because no one, including

DOCSNY-590841

Renaissance, Meritage, Rafael Mayer, Legacy or Khronos, knew or suspected that BLMIS was a Ponzi scheme.   When read in its entirety, the record that the Trustee relies on and quotes selectively from in the Amended Complaint, including (i) the Renaissance Report itself, *see* Am. Compl. ¶ 47; Fisher Decl. Ex. C; (ii) emails among some, but not always all, of the Meritage Committee members, *see, e.g.*, Am. Compl. ¶ 62; November 21, 2003 email from Paul Broder (RE00000240), a copy of which is attached to the Fisher Declaration as Exhibit D; and (iii) transcripts of interviews conducted by the U.S. Securities and Exchange Commission with employees of Renaissance, Paul Broder ("**Broder**"), Nathaniel Simons ("**Simons**") and Henry Laufer ("**Laufer**") (collectively, the "**SEC Transcript,**" attached to the Fisher Declaration as Exhibit E), *see* Am. Compl. ¶ 77, leads to the conclusion that no defendant knew of, or was willfully blind to, the fact that BLMIS was a Ponzi scheme.

As discussed more fully below, Khronos (and, in its own motion to dismiss, Legacy) disputes the Trustee's false characterization of the documents on which he relies in the Amended Complaint.   The Court is permitted to consider other portions of these same documents on this motion to dismiss, because the Court may consider documents "that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit.   Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss." *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 137 (Bankr. S.D.N.Y. 2014) (citation omitted).

The documents relied on by the Trustee in drafting the Amended Complaint consistently reflect that Renaissance and the Meritage Committee did not believe or even suspect that Madoff was operating a Ponzi scheme.   Quite to the contrary, the facts show that members of

8

Renaissance and the Meritage Committee thought that the possibility of this being a fraud was "far-fetched," and that the possibility of fraud did not even occur to them.  By way of example, when interviewed by the SEC, Broder, Simons and Laufer all said that they did <u>not</u> conclude that Madoff was perpetrating a fraud:

- Broder stated, "I think if you're asking did we come to the conclusion that there was a fraud going on, I would say we didn't."  SEC Tr. 34:23-25 (RE00000095).

- Laufer stated,  "Well, the suspicions that I had – I don't want to speak for other people – were questions of, you know, front-running."  *Id*. at 23:12-14 (RE00000124).

- Regarding the Meritage Committee considering withdrawing its BLMIS investment, Simons stated, "And so there was certainly not uniformity in terms of the view on Madoff at that time, again, *because we weren't really contemplating that it was a Ponzi scheme*."  *Id*. at 28:5-7 (RE00000184) (emphasis added).

- Simons stated, "And so I guess I was given a false sense of security by the nature and the structure of Madoff that the likelihood of it being an out-and-out scam was quite – was quite low."  *Id*. at 40:22-25 (RE00000196).

- Simons stated, "So I guess we felt, again, you know, with being such a public figure, being – having such – you know, being a large – you know, a large market-maker, all the other activities, the idea of out-and-out fraud struck me as just too far-fetched.  I mean, I'm sorry, it didn't strike me.  It was probably too far-fetched for me to get my arms around, which is why it never really occurred to me, which is why I wasn't pounding the table at that time saying, we have to get out entirely because I'm not going to – you know, we think that there's a possibility of fraud  You don't – you don't leave half your capital at risk"  *Id*. at 41:8-19 (RE00000197).

9

At most, the Renaissance Report reflects that the Meritage Committee did not understand the implementation of BLMIS's supposed investment strategy and concluded that further inquiry was needed, but it did not conclude that Madoff was a fraud:

- Laufer stated, "We didn't understand what he was doing. We didn't understand how he was doing what he was doing." SEC Tr. 23:2-4 (RE00000124).

- Regarding whether or not Madoff was trading options, Laufer stated, "I didn't understand why he was doing it. I didn't understand many things. *But it did not occur to me that he was – there was some possibility he wasn't [trading options]*." *Id.* at 25:1-3 (RE00000126) (emphasis added).

And the documents relied on by the Trustee also directly contradict the Trustee's allegation that Meritage withdrew its investment in BLMIS because the Meritage Committee suspected Madoff was operating a Ponzi scheme. Am. Compl. ¶ 2. Nathaniel Simons testified to the SEC, "The point is that as we don't know why he does what he does we have no idea if there are conflicts in his business that could come to some regulator's attention . . . *Perhaps the best reason to get out is that we really don't expect to make an outsized return on this investment*." November 13, 2003 Email at RE0000008 (attached to the Fisher Declaration as Exhibit F (RE00000001-8)) (emphasis added).

Further, in the Amended Complaint, the Trustee repeatedly refers to Nathaniel Simons' statement that, "It's high season on money managers, and Madoff's head would look pretty good above Elliot Spitzer's mantle [sic]" which appears in an email produced to the Trustee (Fisher Decl. Ex. F, at RE00000008) and is paraphrased in the SEC Transcript (*see* SEC Tr. 25:4-23 (RE000000181)), both of which the Trustee relies on in the Amended Complaint. Am. Compl. ¶¶ 2, 50. The Trustee would have this Court believe this statement is the smoking gun of the

10

case, and that it shows that Renaissance, the Meritage Committee and Rafael Mayer had actual

knowledge of the Madoff fraud, or suspected there was a high probability that Madoff was

operating a Ponzi scheme.  This is not the Trustee's smoking gun.  It is merely a joke, that

everyone, but the Trustee, appears to be in on:

- SEC:  "Okay.  And then at the bottom you do make this comment about, 'Madoff said it would look pretty good above Eliot Spitzer's mantel.' *I know that's in jest*, but what was kind of the point there?"

- Simons:  "*I thought it was kind of funny.  It was at the time* . . . You know, Eliot Spitzer was cracking down on managers  .  .  .  We were thinking, again, maybe [Madoff]'s doing something illegal because he's front-running his clients and giving his clients bad prices." SEC Tr. 25:4-23 (RE00000181).

Finally, the Trustee's attempt to set Meritage up as a foil to Khronos is contradicted by

the Amended Complaint itself and other facts.  The Trustee misleadingly attempts to create the

false impression that Meritage immediately withdrew its indirect investment in BLMIS once it

supposedly discovered that BLMIS was a Ponzi scheme.  Am. Compl. ¶¶ 2, 51.  As already

summarized above, Meritage did not believe that BLMIS was a Ponzi scheme.  Further, it did not

immediately withdraw its investment following the Renaissance Report.  Indeed, when read

carefully, the Amended Complaint itself concedes that Meritage remained invested with BLMIS

for many months after the Renaissance Report.  *Id*. ¶¶ 138-39.  In fact, Meritage withdrew only

half of its investment months after the Renaissance Report was released and remained invested in

BLMIS for many months thereafter.  *Id*.  Moreover, in its report on BLMIS, the SEC

acknowledges that Renaissance did not withdraw from BLMIS due to its concerns about Madoff,

but rather did so "for unrelated reasons."  Office of Investigations, U.S. SEC, Report No. OIG-

DOCSNY-590841

509, *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme* 157 (Aug. 31, 2009) (the "**SEC Report**").[3]

As discussed more fully below, the Amended Complaint is devoid of facts to support any plausible inference that Khronos had actual knowledge of the Madoff fraud or was willfully blind to that fraud.  For those reasons, and other reasons set forth herein, the Amended Complaint should be dismissed as against Khronos.

## <u>ARGUMENT</u>

The Amended Complaint should be dismissed in its entirety because the Trustee has failed to allege any plausible claim for relief.  As the Supreme Court explained in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007):  "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (second alteration in original) (citations omitted) (internal quotation marks omitted).  "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."  *Id.* at 558 (omission in original) (citation omitted) (internal quotation marks omitted).  Such parameters are meant to ensure, among other things, that defendants are not baselessly thrust into an "inevitably costly and protracted discovery phase" for a wholly groundless claim.  *Asahi Glass Co., Ltd. v. Pentech Pharm., Inc.*, 289 F. Supp. 2d 986, 995 (N.D. Ill. 2003).

---

[3]    Attached to the Fisher Declaration as Exhibit G and available at http://www.sec.gov/news/studies/2009/oig-509.pdf.

DOCSNY-590841

Thus, the Supreme Court has held that a motion to dismiss should be granted where the factual allegations do not "plausibly suggest[]" entitlement to relief. *Twombly*, 550 U.S. at 557. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotations omitted).

As will be discussed more fully below, the Trustee has failed to state a claim, because he has not pled facts that plausibly suggest entitlement to relief. Accordingly, the claim against Khronos should be dismissed.

## I.     THE TRUSTEE HAS FAILED TO PLEAD KHRONOS IS A SUBSEQUENT TRANSFEREE OF AN INITIAL TRANSFER

Count VIII of the Amended Complaint seeks the recovery of subsequent transfers that the Trustee alleges "upon information and belief" were made "directly or indirectly" to Khronos. For the reasons set forth below, the meager, vague allegations regarding the alleged subsequent transfers in the Amended Complaint fail to satisfy the Trustee's pleading burden and Count VIII must be dismissed.

Section 550(a)(2) of the Bankruptcy Code allows the Trustee to recover an avoidable transfer from the initial transferee or "any immediate or mediate transferee of the initial transferee." *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 472 (Bankr. S.D.N.Y. 2015). To properly allege a subsequent transfer claim pursuant to section 550(a), the Trustee must plead that the initial transfer is avoidable, and that Khronos is a subsequent transferee of that initial transfer. *Id.* In order to satisfy the subsequent transferee prong, the Amended Complaint must allege: (1) "facts that support the inference that the funds at

13

issue originated with the debtor"; and (2) "the necessary vital statistics – the who, when, and how much of the purported transfers . . . ." *Id.* at 473 (citations omitted) (internal quotation marks omitted); *see also Merkin*, 515 B.R. at 149-50.

Here, the Amended Complaint does not meet the applicable pleading standard because it fails to identify the actual transfers at issue or facts supporting the conclusory statements that Khronos received subsequent transfers of any supposedly fraudulent transfer. *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. at 474 (dismissing subsequent transfer claims where complaints alleged the initial transfers but "assert[ed], in conclusory fashion, that the subsequent transferee defendants received subsequent transfers"); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 119-20 (Bankr. S.D.N.Y. 2011) ("failure to provide even a modicum of specificity with respect to the Subsequent Transfers so as to put the Defendants on notice as to which ones the Trustee seeks to recover" warranted dismissal of claims to recover subsequent transfers); *Gowan v. Amaranth LLC (In re Dreier LLP)*, 452 B.R. 451, 480 (Bankr. S.D.N.Y. 2011) (allegations that subsequent transferees "may have received" profits and revenues by virtue of their positions in the fund structure were insufficient to plead that the funds were subsequently transferred because there was no indication that the funds were "actually received, i.e., by who, date and amount"). In short, the Trustee has failed to provide any of the vital statistics of the transfers purportedly made to Khronos. The Trustee has generally alleged that Khronos received an unidentified number of transfers from Montpellier and Legacy in the form of fees for investment and accounting services over the course of several years beginning in 2004. Am. Compl. ¶¶ 147-151. These vague allegations that Khronos received a series of fees from Montpellier and Legacy, without more, lack the specificity required to establish that Khronos is a subsequent transferee. Without identifying when the transfers were made, in what

14

amount, or even how many transfers are at issue, the Trustee has failed to adequately plead Count VIII of the Amended Complaint.  *See Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 480 B.R. 480, 491 (S.D.N.Y. 2012) (failure to identify in the complaint the dates and amounts of particular transfers alleged to be fraudulent is fatal to subsequent fraudulent transfer claims); *Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. at 119-20 (dismissing subsequent transfer claims where the complaint merely alleged that "[o]n information and belief, some or all of the transfers were subsequently transferred by one or more [of the Defendants] to another [Defendant] either directly or indirectly" (first and second alterations in original)).  As such, the Amended Complaint should be dismissed, as to Khronos, in its entirety.

Count VIII should be dismissed for the independently sufficient reason that the Trustee has failed to adequately allege that the fees that Khronos purportedly received from Montpellier and Legacy "originated with [BLMIS]."  *Merkin*, 515 B.R. at 149-51.  The Trustee is required to not only allege the details of the alleged fraudulent transfers, but must also allege facts showing that the alleged transfer was made from assets of the Debtor.  11 U.S.C. § 548(a)(1).  While this does not "require dollar-for-dollar accounting" at the pleading stage, it does require plaintiff to allege sufficient facts to show, if proved, "that the funds at issue originated with the debtor." *Merkin*, 515 B.R. at 150.

In the Amended Complaint, the Trustee has made no more than a conclusory statement that the subsequent transfers "were and remain Customer Property."  Am. Compl. ¶ 151.  There is no allegation that the fees Legacy paid came from the Legacy Capital Account, as opposed to some other source.

DOCSNY-590841

Similarly, with regard to the alleged transfers from Montpellier, the Trustee has alleged that Montpellier had indirect investments with BLMIS through Legacy, but nothing in the Amended Complaint states that those were Montpellier's only source of funds or that the fees paid to Khronos were derived from those BLMIS investments. Like the Legacy fees, the Trustee has not made any attempt to trace the fees Khronos received from Montpellier back to BLMIS. Because the Trustee has failed to adequately plead that Khronos' fees derived from BLMIS customer property, Count VIII should be dismissed in its entirety.

Because Count VIII is the only count in the Amended Complaint asserted against Khronos, if the Court dismisses on the ground discussed above, there is no need for the Court to even reach the independent, additional grounds for dismissal set forth below.

## II.    THE TRUSTEE HAS FAILED TO PLEAD WILLFUL BLINDNESS AND KHRONOS' GOOD FAITH IS A COMPLETE DEFENSE TO THE FRAUDULENT TRANSFER CLAIMS

The Trustee's authority to avoid any subsequent transfer made to Khronos is limited by Section 550, which provides that Khronos is entitled to assert a "good faith" defense if the transfer was taken "for value" and "in good faith." *Merkin*, 515 B.R. at 151 (citing 11 U.S.C. § 550(b)); *see also SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18, 20 (S.D.N.Y. 2014). The District Court, in the context of BLMIS-related litigation, has modified the "good faith" defense in the following two ways:

> First, the Trustee must plead and prove the transferee's lack of good faith. Second, the "good faith" standard is subjective rather than objective "because the securities laws do not ordinarily impose any duty on investors to investigate their brokers, [and] those laws foreclose any interpretation of 'good faith' that creates liability for a negligent failure to so inquire."

*Merkin*, 515 B.R. at 138 (quoting *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. at 24). The District Court has further clarified that the subjective "good faith" standard requires the Trustee to show that Khronos "willfully blinded" itself to the fact that Madoff was conducting a

16

Ponzi scheme by "intentionally [choosing] to blind [itself] to the 'red flags' that suggest[ed] a high probability of fraud." *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. at 21.

There are two elements to "willful blindness": (1) "the defendant must subjectively believe that there is a high probability that a fact exists"; and (2) "the defendant must take deliberate actions to avoid learning of that fact." *Merkin*, 515 B.R. at 139 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)). Notably, if the transferee is "simply confronted with suspicious circumstances, [and] fails to launch an investigation of his broker's internal practices – and how could he do so anyway? – his lack of due diligence cannot be equated with a lack of good faith." *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 516 B.R. at 21. Here, the Trustee has failed to allege that Khronos "took deliberate actions to avoid learning" the truth about Madoff's Ponzi scheme; thus, the allegations are insufficient to plead "willful blindness."

### 1.    The Trustee Has Pled Facts Showing Khronos Gave Value

The Amended Complaint alleges facts showing Khronos gave value for the subsequent transfers that it purportedly received. *See Marshall v. Picard* (*In re Bernard L. Madoff Inv. Sec. LLC*), 740 F.3d 81, 91 (2d. Cir. 2014). The Trustee describes Khronos' role as Montpellier's investment manager beginning in 2004, Am. Compl. ¶¶ 148-149, and details the services Khronos provided to Legacy pursuant to the Accounting Services Agreement *see infra* Argument Part II.2. Thus, the first prong of the good faith defense is easily satisfied, even just based on the Amended Complaint's allegations.

### 2.    The Trustee Has Failed To Meet His Burden Of Pleading Khronos Was Willfully Blind To The Fraudulent Scheme

The Trustee has failed to meet his burden of pleading facts showing that Khronos willfully blinded itself to the Madoff scheme. In order to adequately plead willful blindness, the

DOCSNY-590841

Trustee must demonstrate that Khronos "subjectively believe[d] that there was a high probability" that the fraud existed. In the Amended Complaint, the Trustee has done little more than plead a laundry list of "red flags"[4] and identified concerns that *Renaissance* had about its own BLMIS investments. The Amended Complaint is almost silent on Khronos' subjective understanding of the potential fraud. Reciting a list of Madoff's suspicious activity, without alleging Khronos' subjective understanding of that activity, is insufficient to show that Khronos was willfully blind to the fraud. *See, e.g.*, *Newman v. Family Mgmt. Corp.*, 748 F. Supp. 2d 299, 310 (S.D.N.Y. 2010) (allegations were insufficient where they were based on "the numerous red flags that the [d]efendants recklessly disregarded, including among others, Madoff's lack of transparency and 'consistent investment returns,' the discrepancy between Madoff's supposed trading activity and the open interest of index option contracts that BLMIS was audited by a small accounting firm, and the lack of third party administrators and custodians."), *aff'd*, 530 F. App'x 21 (2d Cir. 2013); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 623-24 (S.D.N.Y. 2010) (allegations were insufficient where they were based on consistency of Madoff's "reported excellent results"), *aff'd sub nom. Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618 (2d Cir. 2012); *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680(LLS), 2010 U.S. Dist. Lexis

---

[4]    Purported options trading was impossible (¶¶ 56-71); Timing of Madoff's trades was impossible (¶¶ 72-80); Madoff's unusual fee structure (¶¶ 81-87); Enormous trading volume never impacted the market (¶¶ 88-93); Rates of return were impossible (¶¶ 94-101); Operations lacked transparency and controls (¶¶ 102-105); No capable auditor (¶¶ 106-110); Reported trades outside the daily range (¶¶ 111-115); Account statements showed impossible dividends (¶¶ 116-118); Purported to engage in speculative options trading that deviated from the SSC strategy (¶¶ 119-121); Options confirmations reflected trades inconsistent with SSC strategy (¶¶ 122-126); Aware that options collars purportedly executed by BLMIS were not properly balanced with changes to the composition of the equities basket (¶¶ 127-129); BLMIS account statements showed illegal, unauthorized margin trades (¶¶ 130-132); Aware they were not getting real-time electronic access to accounts and trade confirmations (¶¶ 133-137).

DOCSNY-590841

8597, at *5-7 (S.D.N.Y. Feb. 1, 2010) (allegations were insufficient where they were based on Madoff's request for secrecy and irregular returns).

What the Trustee has pled is Renaissance's concerns over BLMIS, which, as discussed more fully in Argument Section III, *infra*, do not amount to a high probability of the existence of fraud. For example, the Trustee alleges *Renaissance's* concern regarding unexplained options trading by BLMIS, as documented in a November 21, 2003 email from Renaissance employee, Paul Broder. Fisher Decl. Ex. D (RE00000240); Am. Compl. ¶¶ 62-64. But the Trustee fails to point out that neither Rafael Mayer nor Khronos ever received that email. *See* Fisher Decl. Ex. D (RE00000240). Thus, there is absolutely no basis upon which to impute knowledge of this email to Khronos, and the Amended Complaint's allegations based on this email are not only false, but also disingenuous.

Similarly, the Trustee cites a November 13, 2003 email from Nathaniel Simons, in which *Renaissance* questions the auditor Madoff used, but the Trustee makes no allegation of Rafael Mayer or Khronos' subjective understanding of the issue of Madoff's auditor and what his choice of auditor might, or might not, imply. Am. Compl. ¶ 110; *see also* Fisher Decl. Ex. F, at RE00000008.

In support of his allegation that there was a high probability of fraud, the Trustee also cites Renaissance's decision to withdraw its investments with BLMIS. Am. Compl. ¶¶ 2, 51, 138-139. According to the Trustee, the decision to withdraw was based on Renaissance's concerns that BLMIS was a fraud. However, contrary to the Trustee's pleadings, the record reflects that Renaissance's decision to terminate its investment in BLMIS was completely unrelated to these alleged concerns:

> After performing their due diligence, Laufer stated that "we were very worried" about the investment with Madoff. However, opinions diverged at Renaissance

19

about whether to entirely divest itself of the investment.  Broder and Simons wanted to get out of the investment.  But one piece of information "helped to allay concerns" of other employees: "[W]e were aware . . . [Madoff] had been investigated by the SEC."  Because of the competing viewpoints, *Renaissance stated they initially reduced their investment by approximately one half and later got out of the investment entirely for unrelated reasons*.

Fisher Decl. Ex. G, at 157 (emphasis added).  The SEC found that, despite what Renaissance uncovered in its due diligence, Renaissance (i) debated internally whether or not to keep investing in BLMIS and (ii) while initially withdrawing some of its investment, continued to maintain approximately half of its investment with BLMIS.  If Renaissance's decision to withdraw money from BLMIS was motivated by concerns about the legitimacy of BLMIS, it would have requested redemption of all its accounts, rather than maintaining a substantial part of its investment.[5]  The Trustee's suggestion to the contrary is contradicted by the facts and not plausible.

The Trustee also fails to plead whether Khronos knew of certain red flags and Khronos' subjective understanding of those red flags.  Am. Compl. ¶¶ 102-121, 127-137.  For example, the Trustee alleges that Legacy and Khronos were not receiving real-time electronic access to accounts and trade confirmations, but fails to allege whether or not Khronos (or Legacy) were aware of that fact, let alone whether or not Khronos had a subjective understanding that this was an indication of fraud.  *Id*. ¶ 133-137.  It is insufficient, as a matter of law, for the Trustee to recite a list of Madoff's suspicious behavior and not allege Khronos' subjective understanding of that behavior.  Because the Trustee has failed to plead this first prong of the willful blindness standard, the Amended Complaint should be dismissed, as to Khronos, in its entirety.

---

[5]      As Nathaniel Simons told the SEC, if you "think that there's a possibility of fraud[, y]ou don't leave half your capital at risk."  SEC Tr. 41:17-19 (RE00000197).

DOCSNY-590841

The Amended Complaint should also be dismissed for the independently sufficient reason that the Trustee has not pled, as he is required to do, that Khronos took "deliberate actions to avoid learning the fact" of Madoff's fraudulent scheme. *Merkin*, 515 B.R. at 139. Instead, the Trustee has alleged that after the Renaissance Report was shared with Rafael Mayer, Legacy engaged Khronos to conduct a quantitative analysis of Legacy's customer statements.[6] Am. Compl. ¶ 2. According to the Amended Complaint, Khronos made efforts to try to understand the BLMIS trading strategy:

- Khronos developed technology specifically to track pricing and volume statistics to analyze trades dating back to 1992. Am. Compl. ¶¶ 2, 80.

- "Khronos screened investments 'on a quantitative basis to evaluate its overall fit with the portfolio on a risk, return and market correlation basis.' This analysis included, but was not limited to, 'return, volatility, market correlation, sharpe, alpha, beta and draw-down analysis.'" *Id*. ¶ 95.

- "Khronos was responsible for qualitatively evaluating BLMIS's 'adequacy of accounting and back-office processes; the types and applications of internal controls; adherence to compliance, tax, and legal guidelines, integrity of key personnel; . . . and any potential for conflicts of interest.'" *Id*. ¶ 104.

- "[Khronos] received and reviewed trade confirmations

---

[6]    Given the extensive list of duties Khronos was obligated to undertake pursuant to the Accounting Services Agreement, the Trustee's suggestion that David and Rafael Mayer restricted employees' access to Legacy account information is implausible on its face. Am. Compl. ¶ 52. This allegation is also contradicted by the Amended Complaint itself, which states that Rafael Mayer supplied Legacy's statements to Meritage to assist in Meritage's analysis of BLMIS. *Id*. ¶ 46. Also, as alleged in the Amended Complaint, BNP entered into a significant lending relationship with Legacy secured by the Legacy account. *Id*. ¶ 140. In sum, it is clear that the Legacy account statements were shared widely and there was no attempt to shield them under a veil of secrecy.

DOCSNY-590841

and monthly account statements corresponding to the Legacy Capital Account. Khronos valued securities daily according to prices reported by the relevant exchange. Khronos also 'proactively monitored [BLMIS's] investment performance, [which] consist[ed] of an ongoing reapplication of all its qualitative and quantitative analysis.'" *Id.* ¶ 111.

- "Khronos tracked the activity in Legacy Capital's account statements . . . ." *Id.* ¶ 118.

- "Khronos received copies of the [Legacy] trade tickets from BLMIS and was responsible for valuing and verifying [Legacy's] portfolio based on information contained in those trade tickets." *Id.* ¶ 126.

The Amended Complaint, thus, demonstrates that rather than take deliberate actions to avoid learning the facts of the BLMIS investment strategy, both Khronos and Legacy sought to better understand and resolve the concerns raised by the Renaissance Report. In pleading these deliberate actions by Khronos and Legacy, the Trustee has undercut his own allegation that Khronos willfully blinded itself to the Madoff fraud. Having failed to adequately plead that Khronos took deliberate actions to avoid learning the truth of the fraudulent scheme, the Trustee has failed to allege that Khronos was willfully blind. As such, the Amended Complaint should be dismissed as to Khronos, in its entirety.

## III.    THE TRUSTEE HAS FAILED TO PLEAD THAT KHRONOS HAD ACTUAL KNOWLEDGE OF THE PONZI SCHEME

The claim against Khronos is so poorly pled that it is impossible to determine whether the alleged unidentified subsequent transfers to Khronos occurred more than two years before the Filing Date or not. To the extent that any of the unspecified subsequent transfers occurred more than two years before the Filing Date, any claim to recover those transfers should be dismissed for the independent reason that it is barred by the safe harbor in section 546(e) of the Bankruptcy

22

Code because Khronos did not have "actual knowledge" of the Ponzi scheme.  *See, e.g.*, *Merkin*, 515 B.R. at 138; *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, No. 12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) (stating that for the Trustee to allege that section 546(e) should not apply, he "must show, at a minimum, that the transferee had actual knowledge that there were no actual securities transactions being conducted").

The standard for pleading and proving "actual knowledge" is exceedingly high and requires a showing that the transferee had "direct and clear knowledge" of Madoff's Ponzi scheme resulting in "a high level of certainty and [an] absence of any substantial doubt regarding the existence" of the scheme.  *Merkin*, 515 B.R. at 139.  *Merkin* is illustrative of how high the pleading standard is for actual knowledge.  In *Merkin*, the complaint alleged that Merkin openly admitted during various conversations that Madoff "appeared to be running a Ponzi scheme," that BLMIS "could be a Ponzi scheme," and that Madoff's scheme was bigger than Ponzi and that "Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme.'"  *Id.* at 140.  The Court found that because Merkin's statements solely indicated that Madoff "could be" or "appeared to be" running a Ponzi scheme, the allegations, even if taken as true for the purpose of a motion to dismiss, reflected Merkin's "strong suspicion" of the fraud, but did not satisfy "the absence of doubt associated with actual knowledge."  *Id.* at 140-41.  Accordingly, the Court held that the complaint failed to "plausibly allege that Merkin had actual knowledge of Madoff's Ponzi scheme," and dismissed the counts in the complaint that sought to circumvent the safe harbor provision of section 546(e) of the Bankruptcy Code.  Because, as set forth below, the Amended Complaint fails to adequately plead that Defendants had *actual* knowledge of Madoff's Ponzi scheme, it fails to state a claim to the extent it seeks to recover subsequent transfers that may have occurred more than two years before the BLMIS petition was filed..

DOCSNY-590841

In the Amended Complaint, the Trustee has failed to plead facts from which Khronos' actual knowledge of the Ponzi scheme may plausibly be inferred. First, the Amended Complaint does not contain any facts that show Khronos, Legacy or Rafael Mayer had "direct and clear knowledge" of Madoff's Ponzi scheme. The Amended Complaint is woefully silent on what Khronos, Legacy or Rafael Mayer knew. At best, the Trustee has pointed to a handful of emails in which Rafael Mayer indicated that he, like the rest of the Meritage Committee, did not understand how the BLMIS trading strategy was being executed. *See, e.g.*, Am. Compl. ¶¶ 59, 63, 75, 84, 91. This does not demonstrate the "high level of certainty and [an] absence of any substantial doubt regarding the existence" of the fraud necessary to plead actual knowledge. *Merkin*, 515 B.R. at 139.

The Trustee, lacking facts that demonstrate Legacy, Khronos or Rafael Mayer's actual knowledge, attempts to bootstrap Renaissance's supposed knowledge of Madoff's fraud to make his case against Khronos. The fundamental flaw in the Trustee's approach is that the record that the Trustee relies on in the Amended Complaint is clear – nobody had actual knowledge of Madoff's fraud. Renaissance, the Meritage Committee, Meritage, Khronos, Legacy and Rafael Mayer did not suspect, let alone have a high level of certainty, that Madoff was operating a Ponzi scheme. The record is replete with examples of Renaissance's lack of knowledge and lack of suspicion of the fraud. *See, e.g.*, SEC Tr. 34:23-25 (RE00000095) ("I think if you're asking did we come to the conclusion that there was a fraud going on, I would say we didn't.").

Lacking any plausible allegations that Defendants had actual knowledge of Madoff's fraudulent scheme, the Trustee attempts to make his case by repeatedly quoting Nathaniel Simons who stated, "It's high season on money managers, and Madoff's head would look pretty good above Elliot Spitzer's mantle [sic]." Am. Compl. ¶¶ 2, 50. The Trustee's attempt falls

DOCSNY-590841

short.  The Court has soundly rejected stronger allegations of actual fraud in the *Merkin* decision.

In *Merkin*, the Court rejected the Trustee's allegation that Merkin had actual knowledge of the

fraud because he said Madoff "appeared to be running a Ponzi scheme."  The Court reasoned

that Merkin's statements "seem more like jokes than acknowledgments that BLMIS was a Ponzi

scheme."  *Merkin*, 515 B.R. at 140.  The Trustee's reliance on Simons' statement is weaker still

than what was alleged in *Merkin*.  First, unlike in *Merkin*, Simons' statement suggests that

Madoff may be engaged in unlawful conduct, but he does not ever indicate any suspicion that

Madoff was operating a Ponzi scheme.  Second, here, unlike *Merkin*, it is not the Defendants that

are suggesting in jest that Madoff might be a fraudster – it is a non-party to the case.  Finally,

Simons stated in the same SEC transcript relied on by the Trustee that he was, in fact, making a

joke.  *See* SEC Tr. 25:4-23 (RE000000181).  The Trustee has failed to plead that Khronos had

direct, clear knowledge of Madoff's fraud.  Accordingly, any subsequent transfers barred by the

section 546(e) safe harbor should be dismissed.

## CONCLUSION

For the foregoing reasons, Khronos respectfully requests that the Court dismiss the

Trustee's Amended Complaint as against Khronos, with prejudice, and grant such other and

further relief as the Court deems just and proper.

Dated: New York, New York
      July 30, 2015

                        Respectfully submitted,

                        DICKSTEIN SHAPIRO LLP

                        By: /s/ Eric B. Fisher
                              Eric B. Fisher
                              Barry N. Seidel
                              1633 Broadway
                        New York, New York 10019-6708
                        (212) 277-6500
                        (212) 277-6501 (fax)
                        fishere@dicksteinshapiro.com
                        seidelb@dicksteinshapiro.com
                        *Attorneys for Defendant Khronos LLC*

DOCSNY-590841