**STEVENS & LEE, P.C.**
485 Madison Avenue
New York, New York 10022
Nicholas F. Kajon
(212) 537-0403
(610) 371-1223 (fax)
nfk@stevenslee.com

*Attorneys for Legacy Capital Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, <br><br> Plaintiff-Applicant, <br><br> v. <br><br> BERNARD L. MADOFF INVESTMENT SECURITIES LLC, <br><br> Defendant. | SIPA LIQUIDATION <br><br> No.  08-01789 (SMB) <br><br> (Substantively Consolidated) |
| In re: <br><br> BERNARD L. MADOFF, <br><br> Debtor, | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, <br><br> Plaintiff, <br><br> v. <br><br> LEGACY CAPITAL LTD. and KHRONOS LLC, <br><br> Defendants. | Adv. Pro. No. 10-05286 (SMB) |

**LEGACY CAPITAL LTD.'S**
**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION**
**TO DISMISS THE AMENDED COMPLAINT UNDER BANKRUPTCY**
**RULE 7012(b) AND FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ................................................................................................................ 4

I.    THE ALLEGATIONS IN THE AMENDED COMPLAINT DO NOT
      SUPPORT THE INFERENCES URGED BY THE TRUSTEE ........................... 4

II.   THE TRUSTEE HAS FAILED TO PLEAD THAT LEGACY HAD
      ACTUAL KNOWLEDGE OF THE PONZI SCHEME ....................................... 8

III.  THE TRUSTEE'S CLAIM TO RECOVER PRINCIPAL SHOULD BE
      DISMISSED BECAUSE THE TRUSTEE HAS FAILED TO PLEAD THAT
      LEGACY WAS WILLFULLY BLIND TO THE PONZI SCHEME .................. 12

      A.    The Trustee Has Failed To Meet His Burden Of Pleading Legacy
            Subjectively Believed Madoff Was Operating A Ponzi Scheme .............. 12

      B.    The Trustee Has Failed To Plead That Legacy Took Deliberate Steps
            To Avoid Learning Of Madoff's Scheme And Concedes That
            Khronos, On Behalf of Legacy, Undertook Extensive Diligence
            Efforts In Response To Red Flags That Were Raised .............................. 17

CONCLUSION ........................................................................................................... 19

09/18/2015 SL1 1383798v1 106906.00001

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anti-Monopoly, Inc. v. Hasbro, Inc.*,
  958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997), *aff'd*, 130 F.3d 1101 (2d Cir. 199 ....................3

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................................................................. 13

*Comfort Inn Oceanside v. Hertz Corp.*,
  No. 11-CV-1534, 2011 WL 5238658 (E.D.N.Y. Nov. 1, 2011) ............................................7

*Gorfinkel v. Ralf Vayntrub, Invar Consulting Ltd.*,
  No. 13-CV-3093 (PKC), 2014 WL 4175914 (E.D.N.Y. Aug. 20, 2014) ...............................3

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014) ......................15

*In re Beacon Assocs. Litig.*,
  745 F. Supp. 2d 386 (S.D.N.Y. 2010) ................................................................................. 13

*Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*,
  454 B.R. 317 (Bankr. S.D.N.Y. 2011) ..................................................................................9

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011) ..................................................................................... 17, 18

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*,
  515 B.R. 117 (Bankr. S.D.N.Y. 2014) ........................................................................passim

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  516 B.R. 18 (S.D.N.Y. 2014) ................................................................................. 12, 17, 18

*SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*,
  No. 12 MC 115 (JSR), 2013 WL 1609154 (S.D.N.Y. Apr. 15, 2013) ............................. 8, 16

*United States v. Bailey*,
  955 F.2d 28 (8th Cir. 1992) ............................................................................................... 17

*United States v. Ferguson*,
  676 F.3d 260 (2d Cir. 2011) .............................................................................................. 17

*United States v. Joly*,
  493 F.2d 672 (2d Cir. 1974) .............................................................................................. 16

ii

*United States v. Nektalov*,
    461 F.3d 309 (2d Cir. 2006) ............................................................................................16

*United States v. Perez-Padilla*,
    846 F.2d 1182 (2d Cir. 1988)..........................................................................................16

**STATUTES**

11 U.S.C. § 546(e) ............................................................................................................8

11 U.S.C. § 548(a)(1)(A)...................................................................................................3

**OTHER AUTHORITIES**

*2003 Mutual Fund Scandal*, Wikipedia (April 11, 2015, 16:18),
    http://www.wikipedia.org/wiki/20 ....................................................................................14

Landon Thomas Jr., *S.E.C. Putting Mutual Funds Under Scrutiny On Late
    Trading*, N.Y. Times (Sept. 5, 2003), available at
    http://www.nytimes.com/2003/09/05/business/sec-putting-mutual-funds-
    under-scrutiny-on-late-trading.html ..................................................................................14

09/18/2015 SL1 1383798v1 106906.00001

Legacy Capital Ltd. ("**Legacy**") respectfully submits this reply memorandum of law in further support of its motion to dismiss the amended complaint filed by Irving H. Picard, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC ("**BLMIS**") (the "**Trustee**") on July 2, 2015, ECF No. 112 (the "**Amended Complaint**").

## PRELIMINARY STATEMENT

In key respects, the Amended Complaint is not supported – indeed, is contradicted – by the very documents on which the Trustee purports to rely.  The Trustee, in his Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint (the "**Opposition**"), then further obscures the facts, because it takes off into flights of conclusory characterizations that are untethered to specific, factual allegations in the Amended Complaint. The Court's task on this motion to dismiss is first to trim back all of the overgrowth, such that all that remains for consideration are the factual allegations of the Amended Complaint that are not contradicted by the documents relied on by the Trustee.  And then, looking at those factual allegations alone, the key question before the Court is whether those allegations are enough to support a plausible inference that Legacy actually knew of, or was willfully blind to, the BLMIS Ponzi scheme.  In answering those questions, this Court's decisions in *Merkin II* and *Kingate* (the latter decided after Legacy filed its motion to dismiss) are instructive and lead easily to the conclusion that the factual allegations at issue are insufficient to plausibly support the inferences of actual knowledge and willful blindness urged by the Trustee.

The Trustee, in a perversion of the legal standard and common sense, essentially argues that Merkin, who is alleged to have buried his head in the sand in the face of "red flags," is less culpable than Legacy, which is alleged to have hired Khronos to launch an investigation in an effort to understand the concerns that had been raised about BLMIS' trading strategy.  Of course, the Trustee also fails to explain why Legacy would have maintained its investment with BLMIS,

if, through Khronos' due diligence efforts, it had discovered that BLMIS was a Ponzi scheme. The Amended Complaint offers <u>no</u> explanation, let alone a plausible one.

In addition, key allegations in the Amended Complaint are contradicted by facts contained in the very documents purportedly relied on by the Trustee in drafting his complaint. For example, the overarching theme of the Trustee's Amended Complaint is that Legacy must have known of the BLMIS Ponzi scheme because Renaissance supposedly knew of the scheme, and Rafael Mayer, an officer of Legacy and a managing director of Khronos, sat on the investment committee for Meritage, a Renaissance fund. But, as explained in Legacy's opening brief, the facts do not support the inference that Renaissance knew of the Ponzi scheme (let alone Legacy), and Renaissance itself told the SEC, on numerous occasions in transcripts from interviews selectively relied on by the Trustee, that it did not know BLMIS was a fraud. In his Opposition, the Trustee does not dispute that this is what Renaissance itself said about its own state of knowledge. Rather, the Trustee calls Renaissance's credibility into question, contending that Renaissance's statements to the SEC about its lack of knowledge were self-serving, after-the-fact mischaracterizations. Opp'n 29-30. In other words, the Trustee's attempt to draw inferences against Legacy requires the Trustee to attack the credibility of the very evidence on which he relies and to argue that Renaissance did not mean what it told the SEC. *See, e.g.*, Am. Compl. ¶¶ 76-78. This picking and choosing, stretching and twisting of the underlying facts show that the Trustee cannot plausibly support his claim against Legacy. Similarly, the Trustee's throw-everything-against-the-wall-to-see-what-sticks approach shows his failure to sort through the facts to see what legitimately can be tied to Legacy. For example, an email that is critical to the Trustee's allegations was never sent to Rafael Mayer or to anyone else alleged to be affiliated

2

with Khronos or Legacy.  The Trustee's Opposition simply ignores this point made in Legacy's opening brief.

Had the Amended Complaint accurately summarized the relevant facts, the true picture that would emerge is a familiar one:  in response to questions about BLMIS that were raised at certain Renaissance meetings attended by Rafael Mayer in his capacity as a member of the investment committee for a Renaissance fund, Khronos engaged in a due diligence process, on behalf of Legacy, that led it to the view that BLMIS was operating a legitimate and highly regulated securities business and that fraud was not a concern.  Legacy had no special relationship with or access to Mr. Madoff or BLMIS (and the Trustee does not contend that it did).  Following Khronos' due diligence efforts on behalf of Legacy, which were necessarily limited by Khronos' lack of access to BLMIS information, Legacy, like so many other victims of the BLMIS fraud, decided to remain invested in BLMIS and, ultimately, in December 2008, learned that it was a victim of that fraud.

The purpose of this motion to dismiss, of course, is not to determine what version of events is ultimately true.  Rather, it is to put the Trustee to the test at the threshold of the case, before more legal fees are expended and heavier discovery burdens imposed.  Because the Trustee has failed to plausibly support his claims that Legacy had actual knowledge of, or was willfully blind to, Madoff's scheme, the claims in the Amended Complaint should be dismissed with prejudice with the exception of the Trustee's claim seeking the return of net profits under section 548(a)(1)(A) of the Bankruptcy Code.[1]

---

[1]    The Trustee fails to offer any response to Legacy's argument that the claims in the Amended Complaint should be dismissed *with prejudice*.  Accordingly, the Trustee has waived that point.  *See, e.g., Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997), *aff'd*, 130 F.3d 1101 (2d Cir. 1997) ("[U]nder New York state law, the failure to provide argument on a point at issue constitutes abandonment of the issue."); *Gorfinkel v. Ralf Vayntrub,*

3

## ARGUMENT

## I.    THE ALLEGATIONS IN THE AMENDED COMPLAINT DO NOT SUPPORT THE INFERENCES URGED BY THE TRUSTEE

The Amended Complaint fails to offer a plausible account to support the baseless contention that Legacy knew of, or was willfully blind to, the BLMIS fraud.  In setting up Renaissance as the narrative foil to Khronos, and by extension Legacy, the Amended Complaint essentially contends that Renaissance knew BLMIS was a fraud and got out of the investment for that reason; while Legacy, supposedly based on the same information, knew that BLMIS was a fraud, but maintained its investment.  The Trustee's effort to state a claim breaks down completely when one tries to tie that story to the facts actually alleged in the Amended Complaint and contained in documents relied on by the Trustee in drafting the Amended Complaint.

First, Renaissance itself has said on numerous occasions that it did not know that BLMIS was a fraud.  Seven instances in which Renaissance personnel stated that they did not know that BLMIS was a fraud are set forth at pages 8-9 of Legacy's opening brief.  The Trustee's Opposition barely addresses those statements by Renaissance, except to superficially dismiss them notwithstanding that the Trustee relies on other portions of those same SEC transcripts in the Amended Complaint.  Am. Compl. ¶¶ 76-78.

Second, Renaissance did not get out of the BLMIS investment because it was a fraud. The Trustee's causal inference does not make temporal sense, because, as alleged in the Amended Complaint, Renaissance withdrew its investment in stages and many months after allegedly discovering that BLMIS was a fraud.  Am. Compl. ¶¶ 138-139.  As Nathaniel Simons

_Invar Consulting Ltd._, No. 13-CV-3093 (PKC), 2014 WL 4175914, at *4 (E.D.N.Y. Aug. 20, 2014) ("Plaintiff . . . waived any opposition with respect to [defendants'] argument [for dismissal] by failing to oppose the . . . motion [to dismiss] on that basis.").

4

of Renaissance told the SEC: if you "think that there's a possibility of fraud. . . . [Y]ou don't leave half your capital at risk." Declaration of Nicholas F. Kajon in Support of Legacy Capital Ltd.'s Motion to Dismiss the Amended Complaint under Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6), dated July 30, 2015 (the "Kajon Declaration") Ex. D, at 41:17-19 (RE00000197). In other words, Renaissance did not conclude that BLMIS was a fraud. Moreover, Renaissance itself has expressly stated that its reasons for withdrawing from BLMIS had nothing to do with any supposed discovery that it was a fraud. *Id.* Ex. F, at 157 ("Renaissance stated they initially reduced their investment by approximately one half and later got out of the investment entirely for unrelated reasons."). The Trustee's Opposition altogether fails to even grapple with these facts.

Third, contrary to the Trustee's contention, Khronos, and therefore Legacy, was not privy to all of Renaissance's communications about BLMIS. For example, in his Opposition, the Trustee quotes from a November 21, 2003 Renaissance email at even greater length than he does in the Amended Complaint. Yet, as is clear from the email and as Legacy pointed out in its opening brief, Rafael Mayer of Khronos did not receive this email; nor did anyone else alleged to be affiliated with Khronos or Legacy. The Opposition fails to address this point.

Fourth, the Amended Complaint does not plead any facts to support the conclusion that Legacy subjectively believed BLMIS to be a Ponzi scheme. The Trustee's only attempt to even suggest that Legacy behaved in some way that exhibits subjective awareness of wrongdoing by BLMIS is the unsupported allegation that Rafael Mayer and David Mayer restricted access to Legacy's account statements. In the Amended Complaint, this assertion is irresponsibly pled "upon information and belief," and, in its Opposition, the Trustee provides no support for the allegation whatsoever. This unsupported allegation should not be credited by the Court for

5

purposes of deciding this motion because it is contradicted by the Amended Complaint itself, which acknowledges that Legacy supplied its account statements to Renaissance to assist Renaissance with its analysis of BLMIS. *See* Am. Compl. ¶ 71. Further, as an audited entity, Legacy's account statements were supplied to its auditors, established accounting firms with hundreds of offices worldwide, as well as to its bankers at one of the world's largest banks. And, in connection with BNP's decision to lend against Legacy's account statements, obviously BNP reviewed those statements. Thus, the notion that Rafael Mayer and David Mayer maintained secrecy around Legacy's account statements is nonsense and is not a fact that this Court should accept for purposes of deciding this Motion. In any event, even if the allegation were to be treated as true for purposes of this Motion only, this vague, attenuated allegation hardly demonstrates that Legacy subjectively believed that BLMIS was a Ponzi scheme.

The Amended Complaint (and the Trustee's Opposition) contain a litany of red flags that have become well known to the public in retrospect, well after Madoff's fraud was exposed. Throughout, the Amended Complaint recites these now well-known red flags and then concludes that Legacy knew of these red flags, and thus knew BLMIS was a Ponzi scheme, in 2003-2004 because Khronos analyzed Legacy's account statements at that time. But the Trustee utterly fails to plead any facts (as opposed to mere conclusions) to show that any analysis conducted by Khronos actually led Khronos, or Legacy, to the view that BLMIS was a Ponzi scheme. With the benefit of hindsight, many BLMIS investors could now scrutinize their historic statements and note these same red flags. The point is that, at the time, most investors and investment managers, like Khronos, did not understand these red flags to indicate that BLMIS was a Ponzi scheme. Other than unsupported conclusions, the Amended Complaint, when scrutinized

6

carefully, fails to allege any facts to plausibly support an inference that Khronos connected the dots between any red flags and the fact that BLMIS was a Ponzi scheme.[2]

Finally, the Trustee fails to make any plausible sense of his notion that Legacy would remain in the BLMIS investment after Khronos supposedly discovered the BLMIS fraud. According to the Amended Complaint, Khronos supposedly discovered the BLMIS fraud back in late 2003 or early 2004 as the result of allegedly extensive due diligence efforts – not due to any kind of special access to BLMIS, Madoff or any of his co-conspirators. There is no contention that Khronos received enhanced fees or had any other kind of special incentive to maintain Legacy's investments with BLMIS. Why in the world then would Legacy stay invested with BLMIS, if Khronos had managed to ferret out that BLMIS was really a Ponzi scheme? The Amended Complaint does not even attempt to offer a plausible answer to this basic question. It makes no sense to assert, as the Trustee does, that Legacy would decide to remain exposed to the extraordinary risks of investing in a fraudulent scheme, when it had no incentive to do so. *See, e.g., Comfort Inn Oceanside v. Hertz Corp.*, No. 11-CV-1534, 2011 WL 5238658, at *4 (E.D.N.Y. Nov. 1, 2011) (noting that in deciding a motion to dismiss, a "court should draw on its 'judicial experience and common sense' in evaluating sufficiency of pleadings") (quoting *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009)).

Considering only the facts alleged and those found in documents relied on by the Trustee a competing, compelling narrative emerges: Khronos became aware of certain of the red flag concerns identified by Renaissance. It followed up on those red flags, concluded, like so many other victims, that BLMIS was a highly regulated, SEC-registered broker-dealer engaged in a

---

[2]    The Trustee's Opposition provides a laundry list of these red flags at pages 10 through 19 of his Opposition. While this list adds pages to the Trustee's Opposition, his failure to tie these red flags to any subjective conclusion by Khronos that Madoff was a Ponzi scheme renders them irrelevant to the claim against Legacy.

legitimate securities business, and, accordingly, maintained Legacy's investment in BLMIS. Khronos' conclusions about BLMIS were reinforced by BNP's decision to lend to Legacy with only Legacy's BLMIS account as collateral for the loan. BNP's willingness to lend against the BLMIS account was significant to Khronos because BNP, due to its size and sophistication, had far superior access to information about BLMIS.

In sum, the case against Legacy is not special. Legacy is just another BLMIS victim that was deceived into believing that such a highly regulated and well regarded lion of Wall Street could not possibly be engaged in an undetected fraud on such a massive scale. This competing narrative is plausible -- indeed, it is what happened. In contrast, the tale spun by the Trustee in the Amended Complaint rests on implausible inferences from factual distortions.

## II.    THE TRUSTEE HAS FAILED TO PLEAD THAT LEGACY HAD ACTUAL KNOWLEDGE OF THE PONZI SCHEME

Counts II through VII of the Amended Complaint should be dismissed because the Trustee has failed to plead that Legacy had "actual knowledge" of Madoff's Ponzi scheme and thus should be barred from recovering any subsequent transfers that occurred more than two years before the Filing Date, pursuant to the safe harbor in section 546(e) of the Bankruptcy Code.

In order for the Trustee to plead that Legacy had actual knowledge of the Madoff Ponzi scheme, he must allege, at a minimum, that Legacy knew "there were no actual securities transactions being conducted" – i.e., that Madoff was reporting only fictitious transactions. *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC (In re Madoff Securities)*, No. 12 MC 115 (JSR), 2013 WL 1609154, at *4 (S.D.N.Y. Apr. 15, 2013) (the "*Actual Knowledge Decision*"). The Trustee's allegations fall far short of meeting this extraordinarily high burden.

8

The Trustee heavily relies on the *Kingate Decision* to support his argument that the Amended Complaint has sufficiently pled that Legacy had actual knowledge of Madoff's Ponzi scheme. However, a review of the relevant facts the Court relied upon in the *Kingate Decision* in determining that actual knowledge was adequately pled, makes it clear that the alleged facts in this case do not rise to the level of "actual knowledge" – it's not even a close call.[3]

The *Kingate Decision* involves defendants who, unlike the Defendants here, were part of Madoff's "inner circle," had direct access to Madoff, and viewed themselves as a "buffer" between Madoff and his investors. For example:

- Ceretti and Grosso (the individual defendants who formed the Kingate Funds), Madoff and their wives dined together in London;

- Madoff told one potential investor "that he did not meet with investors and [the investor] should meet with Grosso to learn about BLMIS";

- Grosso met with Madoff at least twice a year to discuss the performance of BLMIS and the Kingate Funds;

- In 2001, at Madoff's invitation, Grosso and Madoff had a meeting on the 17th floor offices, which were off limits to all but a few BLMIS employees, select third parties, and Madoff family members;

---

[3]    The Trustee's reliance on *Picard v. Cohmad Sec. Corp. (In re Bernard L. Madoff Inv. Sec. LLC)*, 454 B.R. 317 (Bankr. S.D.N.Y. 2011), is even further off the mark. Cohmad – an entity co-founded by Madoff and named as a compound of the names "Cohen" (the co-founder and Madoff's friend and former neighbor) and "Madoff" – shared office space with Madoff, had "unfettered access to Madoff and BLMIS's offices," including the BLMIS computer systems, and had employees that were paid bonuses and received benefits, such as dental and life insurance plans, directly from BLMIS. *Id.* at 326-27. The "symbiotic relationship" between Cohmad and Madoff/BLMIS and the "deliberate obfuscation of any perception that BLMIS and Cohmad operated as separate and distinct entities," (*id.* at 326) stands in stark contrast to the Amended Complaint that does not contain a single allegation about any special relationship between the Defendants and Madoff. There was none.

9

- Ceretti and Grosso and other FIM employees (the asset management company run by Ceretti and Grosso) participated in 286 telephone conversations with BLMIS between 2004 and 2008, including a long talk on December 2, 2008, days before Madoff's arrest; and

- Grosso also had 225 telephone calls with Cohmad Securities Corp., an entity co-owned by Madoff that referred investors to BLMIS.

Here, there are no allegations that anyone at Legacy or Khronos had a social relationship with Madoff, spoke with Madoff or had unique access to information about Madoff.

In addition, there were allegations in the *Kingate Decision* that made it clear that, in addition to being in Madoff's "inner circle," the defendants made efforts to cover up questions regarding Madoff's operation. Not only did the Kingate defendants express concern that PricewaterhouseCoopers, Kingate's auditors, might actually "start to ask all sort [sic] of questions next time they visit Madoff," they also threatened various parties that raised concerns about Madoff. For example, in response to potential investors who raised concerns about Madoff, Ceretti warned the person fielding the inquiry that [h/she] should "keep [such potential investors] away from now on and let me know if they contact you again," and in response to an HSBC analyst who issued warnings about Madoff's lack of transparency, Ceretti and Grosso responded with veiled threats to HSBC that it could lose the business of the funds and other clients that banked with HSBC, causing HSBC to back off and assure Ceretti that it would fire anyone responsible for issuing the warning. Here, again, there are no allegations that Legacy or Khronos ever attempted to keep information from investors or discourage investor questions about Madoff.

Finally, and most tellingly perhaps, is that the day after Madoff's arrest, the head of operational due diligence at FIM, the asset management company run by Ceretti and Grosso, sent

10

an email in which "he reminded Grosso that he had *previously* emailed Grosso [before Madoff had confessed] 'all the details' to support his belief that BLMIS was a 'scam.'" In this case, in contrast, there is no allegation that any employee of Legacy or Khronos ever expressed any belief that BLMIS was a fraudulent scheme.

Accordingly, the *Kingate Decision* reaffirms what was already evident from *Merkin II*: the standard for pleading and proving "actual knowledge" is extremely high and requires a showing that the transferee had "direct and clear knowledge" of Madoff's Ponzi scheme resulting in "a high level of certainty and [an] absence of any substantial doubt regarding the existence" of the scheme. *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 139 (Bankr. S.D.N.Y. 2014) ("*Merkin II*").

Indeed, Merkin, like the Kingate defendants, "shared a close business and personal relationship" with Madoff: Madoff called Merkin "a good friend" and "a very good client"; they sat together on the board of trustees of Yeshiva University; Madoff attended the bar and bat mitzvahs of Merkin's children; and "Merkin had personal access to Madoff and could speak with him directly, including meeting with Madoff at BLMIS." Further, Merkin openly stated in June 2003 that Madoff's scheme was bigger than Ponzi and that "Charles Ponze [sic] would lose out because it would be called the 'Madoff Scheme,'" advised an investor of "the dangers of investing significant amounts for the long term with BLMIS, and to '[n]ever go long in a big way." *Id.* at 140. Even the facts in *Merkin II*, however, were insufficient for the court to find that the exceedingly high "actual knowledge" standard had been met. *Id.* at 140-41. If Merkin, who was alleged to have had direct access to Madoff and to have made comments about his Ponzi scheme, was not found to have actual knowledge, certainly the allegations regarding Legacy are woefully deficient to survive a motion to dismiss.

11

## III. THE TRUSTEE'S CLAIM TO RECOVER PRINCIPAL SHOULD BE DISMISSED BECAUSE THE TRUSTEE HAS FAILED TO PLEAD THAT LEGACY WAS WILLFULLY BLIND TO THE PONZI SCHEME

It is clear that the claim to recover principal against Legacy also should be dismissed for the additional reason that the Trustee has failed to plead that Legacy lacked good faith. Indeed, the Trustee concedes that for the claim against Legacy to survive, "the Trustee must plead that Defendants willfully blinded themselves to Madoff's fraud" and further acknowledges that this represents a "heightened burden for pleading the defendants' lack of good faith." Opp'n at 21, 26 (citing the *Good Faith Decision* at 24).

Willful blindness requires two elements: (1) Legacy's subjective belief that there is a high probability of the BLMIS Ponzi scheme; and (2) deliberate actions by Legacy to avoid learning of the BLMIS fraud. *SIPC v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 516 B.R. 18, 21 (S.D.N.Y. 2014); *Merkin II*, 515 B.R. at 139 (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011)). The Trustee has failed to meet both elements of the willful blindness heightened pleading standard, and, accordingly, the Trustee has not pled Legacy's lack of good faith, as it is required to do.[4] Count I should be dismissed to the extent that it seeks recovery of principal returned to Legacy by BLMIS.

### A. The Trustee Has Failed To Meet His Burden Of Pleading Legacy Subjectively Believed Madoff Was Operating A Ponzi Scheme

In order for the Trustee to plead Legacy's lack of good faith, he must do so pursuant to a *subjective* standard – rather than an objective one – "because the securities laws do not ordinarily impose any duty on investors to investigate their brokers, [and] those laws foreclose any

---

[4]     The Amended Complaint alleges that Legacy made a principal investment of $126,674,218 into the Legacy Capital Account (Am. Compl. ¶ 142); Legacy therefore "gave value" for the purportedly fraudulent transfers that it received, in satisfaction of the first prong of the good faith defense.

12

interpretation of 'good faith' that creates liability for a negligent failure to so inquire." *Merkin II*, 515 B.R. at 138 (quoting *Picard v. Avellino*, 469 B.R. 408, 412 (S.D.N.Y. 2012)). The Trustee attempts to dilute the applicable standard by discussing, at length, "[t]he objective impossibilities and indicia of fraud alleged by the Trustee" in the Amended Complaint (Opp'n 27), but the Trustee's hindsight analysis of these "impossibilities," without more, simply cannot – and does not – meet this subjective standard.[5]

As an initial matter, in determining whether the Trustee has met this purely "subjective" test, it is crucial to distill what information was – and was not – communicated to Rafael Mayer and Khronos. For example, the Trustee cites to a November 21, 2003 email from Renaissance employee Paul Broder, discussing unexplained options trading by BLMIS; but in the email, Broder specifically states that he has "kept this note to a restricted circulation," and neither Rafael Mayer nor Khronos received that email. *See* Kajon Decl. Ex. C (RE00000240); Am. Compl. ¶¶ 62-64. Not surprisingly, the Trustee failed to address this issue in his Opposition; instead the Trustee baldly states that "[b]oth of [the] conclusions [in the November 21 email] were communicated to Rafael Mayer" – but *fails to cite to anything* in the Amended Complaint, or any other document, to support the statement in his Opposition. Opp'n 15; *see also id.* at 8 (falsely stating, with no support, that Rafael Mayer sent an email "[r]esponding to Broder's [November 21, 2003] analysis").

---

[5]   Not surprisingly the Trustee attempts to rely on cases outside of the BLMIS context to loosen the standard; but this ignores the *Good Faith Decision* and other BLMIS cases decided thereafter that have set forth the appropriate standard for this Court to consider. Opp'n 28-29; *In re Beacon Assocs. Litig.*, 745 F. Supp. 2d 386, 404-05 (S.D.N.Y. 2010) (discussing the standard for proving scienter in a federal securities fraud case through "conscious recklessness"); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 408-10 (S.D.N.Y. 2010)(discussing scienter in a federal securities fraud action and specifically noting, as to one defendant, that his "passive role" in being "a recipient of emails written by others demonstrating a disturbing lack of information" was "not enough to cross over the threshold into scienter").

13

Further, the Amended Complaint lacks any specific allegations concerning Legacy's subjective belief that Madoff was running a Ponzi scheme, nor does the Trustee point to facts known by Khronos or Legacy that raised a "high probability that BLMIS was a fraudulent operation." *See, e.g.*, *Merkin II*, 515 B.R., at 141. Instead, the Trustee has pled facts indicating Renaissance's – but not Khronos' or Legacy's – concerns over BLMIS. In the first instance, it is important to isolate exactly what Renaissance was concerned about because, as the documents make clear, the concerns had nothing to do with whether Madoff's operation was a Ponzi scheme. For example, the Trustee cites a November 13, 2003 email from Nathaniel Simons, in which Renaissance questions various aspects of the BLMIS strategy; however, the email expresses an underlying belief that there are, in fact, trades taking place at BLMIS. Indeed, a key source of this information is from an ex-Madoff *trader*, who was applying for a job at Meritage, and said that Madoff "cherry-picks trades" – clearly implying that trading was taking place, not that Madoff was running a Ponzi scheme, or was a fraudulent operation with no trading activity. In addition, the Trustee repeatedly quotes the portion of the email regarding the statement that "Madoff's head would look pretty good above Elliott Spitzer's mantle" (*see, e.g.*, Am. Compl. ¶ 110; *see also* Kajon Decl. Ex. E), but fails to place this comment in its proper context. The email specifically referenced the "Mutual Fund story" that broke and heightened Broder's concerns; the "Mutual Fund story," which broke in September 2003, involved "late trading," or the purchase of mutual fund shares after the markets had closed, at the closing price for that day.[6] Moreover, the email is completely silent as to Rafael Mayer's or Khronos' subjective view of this information from a "potentially disgruntled," former Madoff trader.

---

[6]        *See* Landon Thomas Jr., *S.E.C. Putting Mutual Funds Under Scrutiny On Late Trading*, N.Y. Times (Sept. 5, 2003), available at http://www.nytimes.com/2003/09/05/business/sec-putting-mutual-funds-under-scrutiny-on-late-trading.html; *2003 Mutual Fund Scandal*,

14

Similarly, the Trustee's overreaching conclusion that the Renaissance Proposal "led to the inexorable conclusion that Madoff could not be trading as the Legacy Capital Account statements purported" is unsupported by the actual document.   Opp'n 5.   The Renaissance Proposal summarized Madoff's strategy as follows:

> Madoff makes a third of his money buying a basket of stocks that are very strongly correlated with the OEX index at a great fill price (relative to the close price) and then putting on a collar with a small spread at essentially no cost.  Additional profit comes from the stocks gain between the bought put and sold call strike price or possible mispricing between the stock basket and options.  Finally, good sell prices (relative to the close) and TBills make up the rest of the returns.

Kajon Decl. Ex. B (RE00004139).  The "proposal" involved trying to replicate the perceived BLMIS strategy through "a combined research and production experiment where we actually trade a modest portfolio" to "further understand the Madoff strategy."  *Id.* at RE00004180.  This document is far from an "inexorable conclusion" that Madoff was a fraud and was not trading as reflected in the Legacy account statements.   Indeed, the very premise of the Renaissance Proposal is that BLMIS was actually involved in trading securities.

Finally the Trustee's reliance on a December 2003 e-mail from Rafael Mayer "listing concerns" regarding Madoff also does not manifest any "red flags" of a possible Ponzi scheme. *See* Am. Compl. ¶ 59; Opp'n 8-9.  Rather, the email, which involves sarcastic interpolations by a Renaissance employee and is thus hard to follow, discusses "open issues for research" and largely focuses on anomalies regarding the volume and pricing of Madoff's option strategies.

---

Wikipedia (April 11, 2015, 16:18), http://www.wikipedia.org/wiki/2003_mutual_fund_scandal (describing then New York Attorney General Eliot Spitzer's investigation into mutual fund timing scandal).   The Court can take judicial notice of "press coverage establishing what information existed in the public domain during periods relevant to [a party's] claims."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

15

The Trustee – faced with suspicions that do not rise to the level of "red flags" that "suggest a high probability of fraud" – attempts to turn the willful blindness standard on its head by suggesting that "even if Defendants 'only' believed BLMIS was engaged in illegal front-running," that would still be enough to satisfy the willful blindness standard in this case. Opp'n 30. The appropriate analysis, however, is whether Legacy had actual knowledge of, or was willfully blind to a *fact*. *See, e.g.*, *Merkin II*, 515 B.R. at 139 ("[t]he line between 'actual knowledge' and 'willful blindness' is difficult to draw. 'Knowledge' is '[a]n awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact,' or 'the fact or condition of knowing something with a considerable degree of familiarity gained through experience of or contact or association with the individual or thing so known.'") (internal citations omitted). We all now know that the Madoff fraud was a Ponzi scheme. The fraud did not involve front running or illegal market timing. Thus, even if Legacy had suspicions of "front running" (which we certainly do not concede it did), Legacy cannot be held liable for being "willfully blind" to a fact that is not true. *See generally Actual Knowledge Decision*, 2013 WL 1609154, at *4 (issue is whether defendant knew that "there were no actual securities transactions being conducted" by BLMIS).[7]

---

[7]    In support of his argument, the Trustee relies on a string of criminal cases addressing the "conscious avoidance" doctrine, which applies when "knowledge of the existence of a particular fact is an element of" a criminal offense. Opp'n 28, 30-31. The cases he relies on are inapposite, ignore the appropriate standard articulated with respect to SEC-registered brokers, like BLMIS, and have no application to this Motion. *See, e.g.*, *United States v. Nektalov*, 461 F.3d 309, 315-16 (2d Cir. 2006) (jury instruction on the doctrine of conscious avoidance was appropriate in a money laundering sting operation where defendant was taped in conversations being told that some "product," or "stuff" was being brought into this country from Colombia and sold "in the streets," but claimed he did not know this referred to drug trafficking); *United States v. Joly*, 493 F.2d 672, 674 (2d Cir. 1974) (conscious avoidance jury instruction was appropriate where the defendant was convicted of importing cocaine and possessing it illegally, arrived at customs with a "bulge" in his waistline, but claimed that "he thought he was doing something wrong but he really didn't know what it was"); *United States v. Perez-Padilla*, 846

16

In order for the Trustee to prevail, he must plead and "prov[e] that [Legacy] willfully blinded [itself] to Madoff Securities' fraud." *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2011); see also *Good Faith Decision*, 516 B.R. at 23. The Trustee has failed to plead that Legacy lacked good faith due to a subjective belief that Madoff was running a Ponzi scheme; accordingly, the claim against Legacy seeking the return of principal should be dismissed.

**B.      The Trustee Has Failed To Plead That Legacy Took Deliberate Steps To Avoid Learning Of Madoff's Scheme And Concedes That Khronos, On Behalf of Legacy, Undertook Extensive Diligence Efforts In Response To Red Flags That Were Raised**

In addition to its failure to plead facts regarding Legacy's subjective understanding of the alleged "red flags," the Amended Complaint should also be dismissed because the Trustee has not pled the second element of willful blindness: that Legacy took "deliberate actions to avoid learning of [the] fact" of Madoff's fraudulent scheme. *Merkin II*, 515 B.R. at 139. The Trustee alleges that "[i]n January 2004, Legacy Capital retained Khronos to conduct an ongoing quantitative analysis of the Legacy Capital Account statements and trade confirmations." Opp'n 9. Indeed, the Trustee concedes that, unlike *Merkin II*, here, the Defendants "'made efforts to try to understand the BLMIS trading strategy,' including tracking pricing and volume statistics, screening investments to evaluate fit [sic] with the portfolio, evaluating the adequacy of BLMIS's accounting and back-office practices, and reviewing trade confirmations and monthly account statements corresponding to Legacy Capital's BLMIS account. The facts here do not

---

F.2d 1182, 1183 (2d Cir. 1988) (conscious avoidance instruction warranted where defendant testified that he knew the package in his suitcase contained something illegal "but thought it was jewelry or a weapon, not drugs"); *United States v. Bailey*, 955 F.2d 28, 29 (8th Cir. 1992) (conscious avoidance instruction appropriate where defendant claimed that he wrongly believes he was carrying a package containing counterfeit money, not drugs, and the package contained "large, hard objects, hardly similar to stacks of currency"); *United States v. Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) (conscious avoidance instruction appropriate where illegality of a transaction was evident from, *inter alia*, "the secret side agreements, the fake offer letter, [and] the accounting pretext for the reinsurance transaction.").

17

present a 'picture of someone who saw red flags and ignored them,' but rather a picture of individuals and entities who took steps to analyze and understand every fictitious trade." *Id.* at 23. On this basis alone, Count I of the Amended Complaint should be dismissed, to the extent that it seeks recovery of principal returned to Legacy by BLMIS, for failure to allege willful blindness.

In arguing that, notwithstanding Khronos' due diligence efforts on behalf of Legacy, Khronos, and by extension Legacy, was willfully blind because "there were no plausible alternatives to the manifold impossibilities and indicia of fraud" (Opp'n 33), the Trustee is blatantly attempting to revert back to the "inquiry notice approach" that has been soundly rejected, numerous times, in prior decisions by the district court as "unfair" and "unworkable." *Good Faith Decision*, 516 B.R. at 22; *see also Picard v. Katz*, 462 B.R. at 455. Indeed, in adopting the willful blindness standard, "this Court rejected the Trustee's alternative 'inquiry notice approach,' under which a transferee may be found to lack good faith 'when the information the transferee learned would have caused a reasonable person in the transferee's position to investigate the matter further." *Good Faith Decision*, 516 B.R. at 21. While under the "inquiry notice approach," a "failure to further investigate constitutes lack of good faith unless even diligent inquiry would not have unearthed the fraud" – this is *not* the "willful blindness" test by which Khronos' diligence efforts, on behalf of Legacy, must be measured. *See Picard v. Katz*, 462 B.R. at 455. In rejecting the Trustee's inquiry notice approach, the court recognized that such an approach would "impose a burden of investigation on investors totally at odds with the investor confidence and securities market stability that SIPA is designed to enhance." *Good Faith Decision*, 516 B.R. at 22.

The Trustee concedes that, in the face of "red flags," Legacy did *not*, as was alleged in *Merkin II*, take "deliberate actions to avoid learning the truth about BLMIS," but rather hired Khronos to launch an investigation to try and delve into the concerns that had been raised. These facts cannot possibly support an inference of "willful blindness."

## CONCLUSION

For the foregoing reasons, Legacy respectfully requests that the Court dismiss Counts II through VII of the Trustee's Amended Complaint with prejudice, dismiss Count I to the extent that it seeks recovery of principal returned to Legacy by BLMIS, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
        September 18, 2015

                                        Respectfully submitted,

                                        STEVENS & LEE, P.C.

                                        By: /s/ Nicholas F. Kajon
                                                Nicholas F. Kajon
                                        485 Madison Avenue
                                        New York, New York 10022
                                        (212) 537-0403
                                        (610) 371-1223 (fax)
                                        nfk@stevenslee.com

                                        *Attorneys for Defendant Legacy Capital Ltd.*

19